UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

    Plaintiff,                        CRIMINAL NO. 09-20295

vs.                                 HON. MARIANNE O. BATTANI

**D-2    SAMUEL L. RIDDLE, JR.,**

    Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

Defendant Samuel Riddle was a public official entrusted by the people of Detroit to work on their behalf.  Riddle violated the public trust in order to enrich himself and to satisfy his own petty greed.  As Chief of Staff to Detroit City Councilwoman Monica Conyers, Riddle partnered with Conyers in multiple corrupt schemes of extortion and bribery in which they exploited their positions of public trust with the Detroit City Council and the Board of Trustees of the General Retirement System so as to enrich themselves.  In return for promises of official action, Riddle and Conyers illegally received tens of thousands of dollars in cash. Through their corrupt partnership, they breached the trust of the citizens of Detroit and the pensioners of the Detroit General Retirement System.

Even aside from his corrupt partnership with Conyers, Riddle acted to corrupt the city government of Southfield by bribing City Councilman William Lattimore.  Furthermore,

Riddle sought to evade the payment of taxes, both on his salary as a public official and on the illegal proceeds of his schemes of extortion and bribery.

Under these circumstances, Riddle should receive a significant sentence of imprisonment.

## II.   RIDDLE'S SCHEMES OF EXTORTION AND BRIBERY

As a public official, Riddle's extensive bribery and extortion schemes are serious criminal conduct that affected the people of the City of Detroit and the City of Southfield. Riddle's actions contributed to a pay to play culture of corruption sapping the strength of Detroit.  Set forth below is a description of Riddle's various schemes of extortion and bribery.

### A.   Attempt to Corrupt the General Retirement System $20,000 from Reggie Barnett

Engaging in "pay to play" tactics with Reggie Barnett, Riddle and Conyers obtained $20,000 from Barnett, who expected to get a multi-million dollar investment from Detroit's General Retirement System in return.  Barnett, one of the owners of Wireless Resources, a technology company located in the Detroit metropolitan area, attempted to get $5 million from the General Retirement System, through the efforts of Riddle and Conyers, whom he paid.  Riddle, one of Barnett's long time friends, initially suggested that Barnett should try to get some money from the pension board.  Barnett was one of many persons and/or businesses that sought pension board money.  It was difficult to even get an opportunity to get a "seat at the table," i.e. make a formal presentation.  It was only through the actions of Riddle and Conyers that he was able to make a presentation to the Board.

- 2 -

In fact, Barnett was very close to receiving the funding from the pension board because of the efforts of Riddle and Conyers; however, Conyers was not able to get other pension board members to go along with her on the risky investment. Nevertheless, she and Riddle still got their money from Barnett, whom Riddle kept assuring that Conyers was his sponsor and strong advocate. For example, in an August 28, 2007 phone call between Riddle and Barnett in which Barnett expresses his frustration that the pension board had not yet agreed to his investment proposal, Riddle reminded Barnett that the pension board deal would not be possible without Conyers: "Oh, but if she, hold it hold it, whatever she is, ya'll wouldn't be in the ball game if she hadn't presented it and pushed it."

### B.     Riddle's Extortionate Scheme:  $20,000 from Demetrios Papas

Riddle and Conyers extorted Demetrios "Jim" Papas into paying Riddle $20,000, ostensibly for consulting work, which was not performed nor contemplated. Riddle and Conyers shared this money. Papas, who had dealt with the City of Detroit for several years because of his businesses in Greektown and other business ventures, complied with the demands because of Conyers' position on the city council.

The first payment from Papas took place in approximately April 2006 when Conyers requested that Papas hire Riddle as a consultant. Papas agreed and signed a $10,000 consulting agreement with Riddle. Papas made the payment, which Riddle shared with Conyers.

In 2007, Papas was trying to purchase a deep injection toxic waste well in Romulus. Critical to the operation of this well was approval of a license transfer by the E.P.A. Papas had already sunk a substantial amount of money into this venture and felt a need to counter

political pressure by opponents of the well.  This prompted Papas to seek help from Monica Conyers, whose husband was a member of Congress.  Conyers was able to obtain a signed letter from John Conyers, Jr, to the E.P.A. in which Conyers endorsed the project.  Monica Conyers and Riddle used the letter as a pressuring device to get Papas to pay them an additional $10,000, again ostensibly for consulting work by Riddle, which none of the parties expected him to perform.  The teamwork of Riddle and Conyers regarding this letter can be shown by a couple of significant phone calls.  These calls clearly demonstrate that Riddle and Monica Conyers were using the letter as a tool of extortion.  On July 5, 2007, before the letter was produced and before Papas gave Riddle and Conyers $10,000, Riddle told Monica Conyers that he would be meeting with Papas in a few days.  He also instructed her, "You don't give him the letter or anything then."  To which Conyers replied, "I won't."

In a conversation with Mary Waters on July 12, 2007, referring to a copy of the letter that was faxed to Monica Conyers, Riddle said, "Cause see the most incriminating thing on this is the fact that the Congressman's office sent it to her.  It says, 'Mrs. Conyers, for your approval.'  And it deals with a matter that's put before the pension board."

### C.    Riddle's Corruption of the Detroit City Council: Extortion Relating to a Strip Club License

In the fall of 2006, a strip club company (Deja Vu) was attempting to get the City Council to approve the transfer of a liquor and topless dancing license from another company so the strip club company could operate in downtown Detroit.  Deja Vu needed Conyers' vote for the transfer to occur.  Monica Conyers told Chris Jackson, a local consultant for Deja Vu, to meet with Riddle to discuss the transfer.

During a meeting with Jackson and Deja Vu executives, Riddle demanded $25,000 in exchange for Conyers' support of the license transfer.  The Deja Vu executives refused to pay the bribe.  As a result, Monica Conyers then voted against the transfer of the license. After the vote, Riddle again contacted Jackson and told him that Deja Vu needed to pay him so that Conyers would reconsider her vote.  Deja Vu officials again rejected Riddle's proposal to get the vote changed in return for cash.  Nevertheless, Jackson separately made a deal with Riddle: an initial $10,000 payment in exchange for Conyers filing a motion to reconsider her vote; and a $15,000  "success fee" if Conyers voted in favor of the transfer. On November 17, 2006, Jackson gave Riddle a $10,000 check (earmarked for the motion for reconsideration) and a $15,000 check (as a success fee).  Riddle said that he could produce the desired result, and that the motion for reconsideration was to show what he could do.  The same day as the $10,000 payment, Conyers made a formal motion to reconsider her vote. Riddle cashed the $10,000 check that day.  Part of the money went to Conyers.

During the morning of November 18, 2006, Conyers said that she wanted to reconsider her vote.  That afternoon, after receiving pressure from several prominent ministers and community members to vote against the transfer, Conyers delayed consideration of the re-vote until after the Council's winter recess.  After observing this, Jackson called Riddle, who was not present at the hearing.  Riddle said that he had talked to Conyers before he left, but that she was unstable and he did not totally control her.  Thereafter, Jackson cancelled the $15,000 "success fee" check.  When the Council resumed session on January 3, 2007, Conyers canceled her request for reconsideration of her previous "no" vote.

D.     **Attempted Corruption of the General Retirement System:**
       **Extortion of Melvin Washington–Multi-Million Dollar Pension Investment**

In 2007, Melvin Washington, a Detroit real estate developer, attempted to have Detroit's General Retirement System invest millions of dollars in a luxury condominium project. Monica Conyers assisted him in this attempt, and, in return, attempted to pressure Washington to enter into a consulting agreement with Riddle so that she and Riddle could share the money that would be paid for the "consulting" in return for Conyers's favorable treatment of Washington by the pension board. Riddle and Washington signed a "consulting agreement" whereby Washington agreed to pay Riddle a percentage of the money received from the pension board. Riddle planned to split that money with Conyers.

E.     **Riddle's Assistance in Delivering Bribe Payments**
       **Relating to the Synagro Sludge-Hauling Contract**

For several months in 2007, one of the major topics of discussion in the Detroit City Council was a proposal to award a multi-million dollar contract to Synagro for the transportation and treatment of waste. Ultimately, Monica Conyers voted that the contract be awarded to Synagro. Her vote was bought by a Synagro representative, who was working with Rayford Jackson. On at least five occasions, Riddle delivered thousands of dollars in bribe money to Conyers that came from Rayford Jackson.

F.     **Bribery of Southfield City Councilman William Lattimore**

In the early part of 2007, Thomas LaBret, the owner of two Zeidman's pawn shops located in Detroit and Southfield, hired Riddle because LaBret anticipated that he may experience difficulties from local officials in his efforts to relocate his Southfield store.

To make sure that there were no problems with city officials, Riddle focused his attention on William Lattimore, a member of the Southfield City Council.  Over the next several months Riddle and Mary Waters dealt with Lattimore.  Lattimore had known Waters when she was in the state legislature.  At the time, Lattimore had been chief of staff for a state senator.  They had not maintained contact after they left Lansing.  However, Waters was Riddle's  contact with Lattimore in setting up bribe payments.

Riddle received a check from LaBret for $10,000 on or about April 27, 2007.  Mary Waters made several phone calls to Lattimore during that period of time. Waters contacted Lattimore and told him that he should speak with Riddle.  Subsequently, Riddle called Lattimore and said that he was trying to help in the relocation of the pawn shop in Southfield.

Lattimore met with Waters, Riddle, and LaBret at a restaurant where Lattimore explained how the approval process worked in Southfield.  LaBret gave Lattimore an overview of his relocation plans.  After they left the restaurant, Riddle and Waters told Lattimore that he would be "taken care of."

Shortly after this, Lattimore was contacted by Waters to set up a meeting at a Starbuck's coffee shop.  Waters told Lattimore that he would be paid.  Riddle and Waters came to the coffee shop in one car while Lattimore came in another.  After leaving the coffee shop, Riddle got into Lattimore's car and gave him an envelope that contained $7,500 in cash.

In a telephone conversation with LaBret, Riddle assured him that everything should go smoothly - "Don't think will have problem with city council.  Strongest opponent - have him locked down."

On October 4, 2007, LaBret informed Riddle that the renderings for the remodeling of the building were ready, and that he would like to meet with Lattimore.  This prompted Riddle to call Waters to set up a meeting.  That call included the following dialogue:

Riddle:       Set us up a meeting as soon as possible.  I don't know if it has to be today.  Today is too late.  But set us up a luncheon meeting or a meeting as soon as possible. So he can go over the renderings.  What's that guy?  The council-man's name out there?

Waters:      Lattimore.

Riddle:       Is it Bill Lattimore?

Waters:      Yeah.

Riddle:       He hasn't done nothing for the money yet except do one letter.  That ain't enough for 7,500.  Anyway.

Riddle, Waters, Lattimore, and LaBret met the following day.

On October 12, 2007, Riddle received a $20,000 check from LaBret and cashed it at the pawn shop in Southfield that day.  In the morning, Waters called Lattimore to arrange a meeting later that day.  Riddle and Waters discussed the relative size of the payment.

Riddle:       What are you doing?  Don't forget to have that conversation with Bill.

Waters:      I did.  I did.

Riddle:       Okay.  Okay.  But he'll be happy anyway.

Waters:      Yep.

Riddle:       Uh, he's just gonna have to figure out how to do more with less.

Waters:      Uh-huh.

Riddle:       Yeah.  Uh, he wasn't gonna give them guys that much anyway.

- 8 -

Waters:     (Laughs) That's about the size of it.

Riddle:      Yeah.

Waters:     I wouldn't because then you start to look suspicious.

Later that day, Lattimore called Riddle and left a message.  He said that Waters had called earlier to tell him that they were going to meet that day.  Waters had told Lattimore that the second bribe payment would be smaller than the first payment.  About ten minutes later, Riddle called Lattimore back, and they agreed to meet at a coffee shop.  Lattimore and Riddle did meet later that day at a Starbuck's coffee shop in Birmingham.  Riddle gave him $5,000 in cash.

The three payments by LaBret to Riddle totaled $45,000.  In addition, Riddle received a Breitling watch worth $5,500, and Waters got a $6,000 Rolex watch from LaBret.

At the May 5, 2008 meeting of the Southfield City Council, the relocation of the pawn shop was discussed.  Lattimore was a vocal advocate for the proposed move of the pawn shop. On the motion of Lattimore, the Council approved the site plan.

### G.     Riddle's Attempt to Evade Payment of 1999 Income Taxes

In 1999, Riddle received approximately $80,000 in income from the Colorado Secretary of State.  He did not report this income, which was paid to him as an independent contractor.  Because the State of Colorado reported the payments, the I.R.S. was aware that Riddle had not reported this income.  This did not catch up to him until Riddle began working for Monica Conyers and received income from the City of Detroit, which reported it to the I.R.S.  Consequently, in October 2007, the I.R.S. placed a levy on the checks that he

was receiving from the City of Detroit. During this period of time, Riddle was also receiving other income which was not reported to the I.R.S. In an attempt to prevent the I.R.S. from making claims for the additional income, Riddle dealt in cash after realizing the I.R.S. would try to attach his bank accounts.

Phone calls intercepted in October and November 2007 make it apparent that Riddle was aware of the levy and that he would, therefore, be dealing in cash, in order to evade payment of taxes. On December 14, 2007, Riddle made an important comment to a friend regarding the Internal Revenue Service: "The feds move in a really weird way when they get ready to whack ya and the most dangerous thing you can have on you, ask Al Capone, is the IRS."

### H.    Riddle's Evasion of Taxes for 2006 and 2007

Besides the W-2 income that Riddle was receiving from the City of Detroit in 2006 and 2007, Riddle also had other income which was not reported to the I.R.S. This included both legitimate income and bribe payments. Only after Riddle and Waters realized that they were being scrutinized by the I.R.S., did they attempt to report this additional income.

In November 2007, about a month after the I.R.S. had imposed a levy on Riddle's Detroit income, Mary Waters attempted to alleviate this problem and contacted a tax preparer, who put together Riddle's returns for 2006 and 2007. Riddle's 2006 return was based on information on file with the I.R.S., that is, his W-2 income from the City of Detroit. Riddle's 2006 tax return was false in that it did not include income that Riddle earned from

bribe payments and from legitimate work that he had performed.  Waters subsequently picked up Riddle's 2006 return, which he signed and Waters filed.

It was only after Riddle and Waters became aware, through their Indictment in July 2009, that the FBI and the U.S. Attorney's office were aware of Riddle's other income, that is, the bribe payments detailed in the two Indictments, that Waters went back to the tax preparer in July and August 2009 to have Riddle's returns amended to include the additional, unreported income.

## III.   RIDDLE'S EXTENSIVE CRIMINAL HISTORY FURTHER SUPPORTS A SIGNIFICANT PENALTY

Another important factor supporting a significant sentence is Riddle's extensive criminal history.  Riddle's criminal conduct includes a felonious assault with a shotgun while he was on bond awaiting trial in his two federal cases.  His criminal history demonstrates an extreme lack of self control, a propensity to violence, and behavior that is destructive of himself and others.  For example, Riddle has three prior convictions for drunk driving, twice in Colorado in 2001, and once in Michigan in 2004.  In addition, Riddle was convicted in May 2010 of felonious assault and a firearms charge.  In that case, Riddle pointed a shotgun at co-defendant Mary Waters and racked it while threatening her.  In a very similar incident in Flint, Michigan in 1986, Riddle threatened a victim with a 9mm semi-automatic pistol. In that case, Riddle pointed the loaded pistol at the victim and stated, "I could kill you right now and no one would ever know."  Riddle then threw the pistol at the victim.  After

retrieving the pistol, Riddle stated, "I can kill you and get away with it." Riddle was convicted of felonious assault in 1988 for this incident.

Riddle's significant and serious criminal history, the multifaceted and extensive nature of his bribery and extortion schemes, and his contempt for the legal system as set forth below, all combine to establish Riddle's lawlessness. In Riddle's view, the normal rules of civilization do not apply to him. These circumstances lend further support to imposing a significant sentence of imprisonment.

## IV.    RIDDLE'S CONTEMPT FOR COURT ORDERS

Riddle was openly contemptuous of a Protective Order that was entered in the related case of United States v. Samuel Riddle, Case No. 09-20025. This Court should take Riddle's contempt into consideration in fashioning its sentence in this case and in considering his character. On December 7, 2009, the court entered a Protective Order prohibiting all of the parties, including Riddle, from making extrajudicial comments to the media about the case. This was done in order to limit the amount of pretrial publicity that could possibly taint the jury pool. Subsequently, however, Riddle repeatedly violated this Order by constantly commenting on the case to the media.

## V.    SENTENCE DISPARITY

It is anticipated that Riddle may argue that he should receive a sentence lower than the 37 months of imprisonment that Monica Conyers, an elected public official, received in her case. This argument is flawed for many reasons: Riddle, as Conyers' Chief of Staff, also was a public official; Riddle, unlike Conyers, has an extensive criminal history; Riddle,

- 12 -

unlike Conyers, was engaged in an additional, unrelated criminal conspiracy to bribe councilman William Lattimore; Riddle pleaded guilty to multiple bribery and extortion schemes, while Conyers only pleaded guilty to the Synagro bribery; Riddle, unlike Conyers, pleaded guilty to tax evasion; Riddle has repeatedly demonstrated his contempt for law enforcement and the judicial system.  For all of these reasons, Riddle should not receive a sentence lower than Conyers.

## VI.    CONCLUSION

The government respectfully requests that the Court impose a sentence of 37 months as called for under the terms of the Rule 11 Plea Agreement.  As a public official, Riddle's crimes of corruption were serious and extensive.  His significant criminal history and contempt of court orders are aggravating factors that further support a substantial penalty.

Respectfully submitted,

**BARBARA L. MCQUADE**
United States Attorney


s/ ROBERT CARES

Assistant U.S. Attorney
211 West Fort, Ste. 2001
Detroit, MI 48226
(313) 226-9736
Robert.Cares@usdoj.gov
P28888

s/ DAVID A. GARDEY

Assistant U.S. Attorney
211 West Fort, Ste. 2001
Detroit, MI  48226
(313) 226-9591
David.Gardey@usdoj.gov
P48990


**Dated:  October 1, 2010**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on Friday, October 1, 2010, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system which will send notification

of such filing to the following:

Richard Convertino, Esq.

s/ ROBERT CARES

Assistant U.S. Attorney
211 West Fort, Ste. 2001
Detroit, MI 48226
(313) 226-9736
Robert.Cares@usdoj.gov
P28888

- 15 -